1999-NMSC-017

980 P.2d 23

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Charles CLEVE, Defendant–Petitioner.**

No. 24,734.

Supreme Court of New Mexico.

March 11, 1999.

Phyllis H. Subin, Chief Public Defender, Christopher Bulman, Assistant Appellate Defender, Santa Fe, for Petitioner.

Hon. Patricia A. Madrid, Attorney General, Ralph E. Trujillo, Assistant Attorney General, Santa Fe, for Respondent.

James R. Scarantino, Albuquerque, Birch, Horton, Bittner and Cherot, William P. Horn, Douglas S. Burdin, Washington, DC, for Amicus Curiae Wildlife Conservation Fund of America.

## OPINION

SERNA, Justice.

{1} Defendant Charles Cleve appeals the Court of Appeals' affirmance of his two convictions of cruelty to animals. A jury found Cleve guilty of two counts of unlawful hunting and two counts of cruelty to animals based on his killing of two deer. Cleve contends that his actions, while within the scope of the prohibition against unlawful

hunting, are not contemplated by the prohibition against cruelty to animals. We hold that New Mexico's statute proscribing cruelty to animals applies only to domesticated animals and wild animals previously reduced to captivity. Additionally, we believe it is necessary to clarify the application of the general/specific statute rule in New Mexico. Applying this rule, we hold that the comprehensive laws in New Mexico governing hunting and fishing preempt application of the cruelty-to-animals statute to the hunting of game animals. We therefore reverse Cleve's cruelty-to-animals convictions.

## I. Facts

{2} Cleve owns a one-hundred acre ranch near Elk, New Mexico. At one time, Cleve maintained a herd of approximately three hundred cows on the land. Beginning in the early 1970's, however, Cleve began having difficulty with as many as one hundred deer coming onto his land and destroying his crops and pastures. As a result, Cleve needed to purchase more feed and was forced to reduce the number of cows in his herd.

{3} Around 1977, Cleve began requesting assistance from the New Mexico Department of Game and Fish (Department) in alleviating his deer problems. Over the course of approximately twenty years, the Department, through numerous means, attempted to reduce the number of deer on Cleve's property. The Department eventually leased Cleve's property for two years and used it as a wildlife viewing area. In 1994, the Department, although recognizing the persistence of the deer problem, terminated its lease and, the following year, notified Cleve that it had exhausted its efforts to alleviate his situation.

{4} Three months after receiving the letter from the Department, faced with a continued presence of deer on his land and apparently no further outside assistance, Cleve decided to kill some of the deer. On several occasions, Cleve shot at the deer on his property. Witnesses reported that Cleve shot in the direction of a fishing camp, as well as a highway, and that several bullets had gone into the camp area. Cleve shot at least thirteen deer, five in the abdomen, and snared two others. In one of the snares, a fawn was caught by the neck and died of strangulation, probably within about five minutes of being caught. In the other snare, a spike buck was caught by its antlers and died of either stress-related fatigue, starvation, or dehydration.

{5} The State charged Cleve with three counts of negligent use of a deadly weapon, see NMSA 1978, § 30–7–4 (1993), seven counts of cruelty to animals, see NMSA 1978, § 30–18–1 (1963), and fifteen counts of unlawful hunting, see NMSA 1978, § 17–2–7(A) (1979). The State relied on the two snared deer and the five deer shot in the abdomen for the cruelty-to-animals charges. Cleve filed a motion to dismiss the cruelty-to-animals charges on the ground that Section 30–18–1 is limited to domesticated animals and does not contemplate cruelty to game animals. The trial court denied the motion. The jury found Cleve guilty of two counts of unlawful hunting, two counts of cruelty to animals, and one count of negligent use of a deadly weapon. The two snared deer formed the basis for the convictions of unlawful hunting and the convictions of cruelty to animals.

{6} Cleve appealed his conviction of two counts of cruelty to animals to the Court of Appeals. Cleve argued that game and fish statutes and regulations preempt application of Section 30–18–1 to game animals. In addition, Cleve contended that Section 30–18–1 is limited to cruelty committed against domesticated animals. The Court of Appeals rejected both of Cleve's arguments and affirmed his convictions. *State v. Cleve*, 1997–NMCA–113, ¶¶ 3–15, 124 N.M. 289, 949 P.2d 672. The Court of Appeals concluded that the prohibition against unlawful hunting contained in Section 17–2–7 and the prohibition against cruelty to animals contained in Section 30–18–1 "exist for different purposes." *Id.* ¶ 7. "It is possible to illegally hunt game animals, but not to have been cruel in killing them.... Conversely, one could be convicted of cruelty to animals, but not of unlawful hunting of game animals." *Id.* ¶ 8. The Court of Appeals concluded that "both the cruelty statute and the game and fish laws and regulations are necessary to fully protect wild animals, and these two statutes can coexist." *Id.* Additionally, the Court of Ap-

peals concluded that game animals must be included within Section 30–18–1 because to hold otherwise would "leav[e] many animals unprotected [and] would create an unjust or absurd result." *Id.* ¶ 12. We granted Cleve's petition for writ of certiorari to the Court of Appeals in order to examine the scope of Section 30–18–1 and its relationship to Section 17–2–7 and other laws governing hunting and fishing, and we now reverse.

## II. Standard of Review and Rules of Statutory Construction

{7} Cleve argues that the trial court and the Court of Appeals misconstrued Section 30–18–1 as being applicable to his snaring of two deer. The "[i]nterpretation of a statute is an issue of law" that is subject to de novo review. *State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995).

{8} Our ultimate purpose in the interpretation of a statute is to ascertain and give effect to the intent of the Legislature. *Roth v. Thompson,* 113 N.M. 331, 332, 825 P.2d 1241, 1242 (1992). In doing so, we look first to the plain language of a statute. *Wilson v. Denver,* 1998–NMSC–016, ¶ 16, 125 N.M. 308, 961 P.2d 153. However, "courts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 353, 871 P.2d 1352, 1359 (1994). As a result, we must examine the context surrounding a particular statute, such as its history, its apparent object, and other statutes in pari materia, in order to determine whether the language used by the Legislature is indeed plain and unambiguous. *See id.*

## III. Interpretation of Section 30–18–1

{9} Section 30–18–1 provides:
Cruelty to animals consists of:

A. torturing, tormenting, depriving of necessary sustenance, cruelly beating, mutilating, cruelly killing or overdriving any animal;

B. unnecessarily failing to provide any animal with proper food or drink; or

C. cruelly driving or working any animal when such animal is unfit for labor.

The Court of Appeals concluded that the phrase "any animal" plainly means all animals, including game animals. *See Cleve,* 1997–NMCA–113, ¶ 12, 949 P.2d 672. The Court of Appeals relied on the lack of definition for "animal" in Section 30–18–1, unlike the cruelty statutes of some other states, *id.* ¶¶ 10–11, and the lack of alternative protection for many animals if they were excluded from Section 30–18–1. *Id.* ¶ 12. Additionally, the Court of Appeals reviewed other criminal statutes relating to animals containing specific references to domesticated animals and concluded that the lack of specificity in Section 30–18–1 was a deliberate choice of the Legislature. *Id.* ¶ 13. We disagree with the Court of Appeals' construction of Section 30–18–1.

{10} In *State v. Buford,* 65 N.M. 51, 331 P.2d 1110 (1958), this Court reviewed a statute nearly identical to Section 30–18–1 in defining cruelty to animals. *See id.* at 52, 331 P.2d at 1110 (quoting in substantial part 1887 NM Laws, ch. 1, § 1 (repealed 1963)). The prosecution in *Buford* charged the defendant with cruelty to animals in relation to a cockfighting incident. *Id.* at 51, 331 P.2d at 1110. In determining whether New Mexico's cruelty-to-animals statute prohibited cockfighting, we discussed the cruelty-to-animals statutes of a number of other states. *Id.* at 52–55, 331 P.2d at 1111–13. In addition, we reviewed England's Cruelty to Animals Act, which also prohibited the overdriving, abusing, or torturing of any animal and which defined any animal as meaning horses, dogs, cats, and other domestic animals. *Id.* at 55–57, 331 P.2d at 1113–14. We assumed in *Buford* that gamecocks fell within the phrase "any animal" in New Mexico's cruelty-to-animals statute. *Id.* at 52, 331 P.2d at 1111. In addition, we acknowledged that the terms torture and torment "would seem to embrace fighting cocks equipped with artificial spurs or gaffs capable of cutting deep wounds and sharp gashes in the cocks." *Id.* at 57–58, 331 P.2d at 1114. However, we "look[ed] at the statute as a whole," and we noted that "[t]he

language of the statute ... seems to apply only to brute creatures and work animals and the history shows that it was passed in relation to other laws governing livestock." *Id.* at 58, 331 P.2d at 1114–15. As a result, because, unlike most states, no New Mexico statute specifically prohibited cockfighting, we applied the rule of lenity and determined that "the type of cruelty to animal statute we are construing was not passed with the intention of prohibiting such sports as cockfighting." *Id.* at 58, 331 P.2d at 1115.

{11} The Court of Appeals concluded that our discussion of the cruelty-to-animals statute applying only to brute creatures and work animals constituted dicta. We disagree. Obiter dictum is defined as "[w]ords of an opinion entirely unnecessary for the decision of the case." Black's Law Dictionary 1072 (6th ed.1990). The language quoted above from *Buford* clearly demonstrates that our discussion of the history and scope of the cruelty statute, far from being idle observation, was essential to our analysis of the Legislature's intent and directly influenced our holding that the statute did not apply to cockfighting. While it is true that we assumed without deciding that the cruelty statute protected gamecocks, we did not assume that the phrase "any animal" had the broad meaning attributed to it by the Court of Appeals in this case. Instead, as noted in *Buford*, some courts had apparently held gamecocks to be domestic animals within the provisions of cruelty-to-animals statutes expressly limited to the protection of domesticated animals. *See Buford*, 65 N.M. at 52, 56–57, 331 P.2d at 1111, 1114. Thus, we understand *Buford* as assuming that, even though the history of New Mexico's cruelty statute suggested that it applied only to work animals, the Legislature also intended to protect domesticated animals such as gamecocks from cruelty, though not from such sports as cockfighting. To the extent *Buford* stands for the proposition that the Legislature, in enacting the cruelty to animals statute, primarily intended to protect work animals and that the Legislature did not intend to prohibit such sports as cockfighting, it is binding

precedent in New Mexico, and the State fails to argue that it should be overruled.

{12} In any event, we are persuaded that *Buford* accurately captures the history and scope of cruelty to animals statutes in New Mexico, including the present version contained in Section 30–18–1. First, although under the plain language rule the phrase "any animal" would seem to imply a broad meaning, the language of the statute as a whole negates such an implication. Section 30–18–1 contains three subsections. Section 30–18–1(B) and Section 30–18–1(C) prohibit behavior that could only apply to domesticated animals or wild animals previously reduced to captivity: unnecessarily failing to provide proper food or drink and cruelly working an animal that is unfit for labor. Despite such a necessarily limited scope, both of these subsections include the phrase "any animal." Clearly, the Legislature did not intend to create a duty on the part of the public to provide sustenance to wild animals. Similarly, while Section 30–18–1(A) prohibits some conduct that could apply to both domesticated and wild animals, such as torturing, tormenting, cruelly beating, mutilating, or cruelly killing any animal, it also proscribes conduct, such as depriving of necessary sustenance and overdriving, that necessarily excludes wild animals. We do not believe the Legislature intended a different meaning for the phrase "any animal" between different subsections of the same statute and within a single subsection. To the contrary, we believe the Legislature intended that the phrase "any animal" denote domesticated animals and wild animals in captivity throughout Section 30–18–1. In fact, the statute at issue in *Buford*, which did not contain discrete subsections like Section 30–18–1, provided:

> If any person torture, torment, deprive of necessary sustenance, cruelly beat, mutilate, cruelly kill or overdrive *any animal*, or unnecessarily fail to provide *the same* with proper food or drink, or cruelly drive or work *the same* when unfit for labor, he shall be punished by a fine ....

1887 NM Laws, ch. 1, § 1 (emphasis added). We believe the use of "the same" to describe "any animal," like the repeated use of "any animal" in Section 30–18–1, supports a conclusion that the Legislature intended the

245

same meaning for the phrase throughout the statute. As with Section 30–18–1(B)–(C), it is clear that the Legislature did not intend the latter prohibitions in the prior statute to apply to wild animals. Therefore, from the contextual language of Section 30–18–1, we conclude that the Legislature intended the phrase "any animal" to mean domesticated animals and wild animals previously reduced to captivity.

{13} In addition to the language of the statute, we believe the history of Section 30–18–1 and other statutes in pari materia also support the conclusion that the Legislature did not intend to include wild animals in Section 30–18–1. As previously mentioned, Section 30–18–1, enacted by 1963 NM Laws, ch. 303, § 18–1, replaced a cruelty statute enacted by the Legislature in 1887. The Legislature placed the statute under a general article entitled "Animals." This article contains seven separate sections relating to criminal offenses involving animals. *See* 1963 NM Laws, ch. 303, §§ 18–1 to –7 (codified at NMSA 1978, §§ 30–18–1 to –2, –3 to –7 (1963)). In addition to the cruelty-to-animals prohibition in Section 18–1, the other statutes in the article are as follows: Section 18–2 prohibits the injury of "any animal or domesticated fowl which is the property of another," Section 18–3 prohibits the unlawful branding of "any animal which is the property of another;" Section 18–4 prohibits the "unlawful disposition of animal," including "abandoning any livestock," taking livestock for use without the owner's consent, and "driving or leading any animal being the property of another from its usual range, without the consent of the owner;" Section 18–5 prohibits the illegal confinement of animals and refers to "any cow," "any bull," "offspring of livestock," and "any freshly branded animal;" Section 18–6 prohibits the transporting of stolen livestock; and Section 18–7 prohibits the misrepresentation of pedigree "of any animal." We believe that these statutes, enacted in conjunction with Section 30–18–1, under the same article, and regarding a similar subject matter, are in pari materia with Section 30–18–1. *See Roth,* 113 N.M. at 334, 825 P.2d at 1244 ("A fundamental rule of statutory construction is that all provisions of a statute, together with other statutes in pari materia, must be read together to ascertain the legislative intent."). Each of these other statutes exclusively concern livestock and other animals possessed by humans, yet these statutes variously use the phrase "any animal" to describe the domesticated animals covered by the statute. Similar to the history of the statute at issue in *Buford, see Buford,* 65 N.M. at 58, 331 P.2d at 1115 (stating that "the history [of the cruelty to animals statute] shows that it was passed in relation to other laws governing livestock"), we believe these statutes clarify that the phrase "any animal" in Section 30–18–1 extends only to domestic animals and wild animals previously reduced to captivity. *See State v. Ogden,* 118 N.M. 234, 243, 880 P.2d 845, 854 (1994) ("Statutes on the same general subject should be construed by reference to each other, the theory being that the court can discern legislative intent behind an unclear statute by reference to similar statutes where legislative intent is more clear ." (citation omitted)). Thus, we conclude that the Legislature enacted the entire article, 1963 NM Laws, ch. 303, §§ 18–1 to –7, with the exclusive purposes of controlling certain human behavior in relation to domesticated animals and protecting the property rights of the owners of domesticated or previously captured wild animals.

{14} Finally, we presume that the Legislature was aware of *Buford* and our interpretation of the former cruelty-to-animals statute, 1887 NM Laws, ch. 1, § 1, when it repealed that statute and enacted Section 30–18–1 in 1963. *See V.P. Clarence Co. v. Colgate,* 115 N.M. 471, 474, 853 P.2d 722, 725 (1993) (stating that "the [L]egislature is presumed to act with knowledge of relevant case law"). The Legislature could have easily inserted a definition of "animal" in Section 30–18–1 if it had disapproved of our interpretation of the scope of the statute in *Buford. Cf. Slygh v. RMCI, Inc.,* 120 N.M. 358, 360, 901 P.2d 776, 778 (Ct.App.1995) (presuming the Legislature to have been aware of existing judicial pronouncements and stating that the Legislature "could have expressly" taken a different approach). Instead, the Legislature reenacted the statute with largely stylistic changes in the definition of the crime.

{15} From the context surrounding the enactment of Section 30–18–1, we conclude that the Legislature intended the phrase "any animal" to include domesticated animals and wild animals in captivity and did not intend to include other wild animals. We disagree with the Court of Appeals' assessment that such an intent would be absurd or unjust. While many may regard it presently desirable for New Mexico to protect all animals, including wild animals, from human cruelty, "[a] statute is to be interpreted as the Legislature understood it at the time it was passed." *Pan Am. Petroleum Corp. v. El Paso Natural Gas Co.*, 82 N.M. 193, 196, 477 P.2d 827, 830 (1970). Our role in statutory interpretation is not to sculpt the most just law possible out of the words used by the Legislature or to attribute the meaning to a statute that contemporary ideals would deem preferable. *Cf. Salazar v. St. Vincent Hosp.*, 95 N.M. 150, 153, 619 P.2d 826, 829 (Ct.App.1980) ("To construe legislation on the basis of contemporary meanings of words used by the enacting legislature would make a mockery of legislative intent . . . ."). Our role is to determine the intent of the Legislature. It has not been uncommon, both at the time the Legislature enacted Section 30–18–1 and at present, for state legislatures to limit cruelty to animals statutes to domesticated animals and wild animals in captivity. *See, e.g.*, Iowa Code § 717B.1(1)(b) (1995) (excluding from the crimes of animal abuse and neglect, among other things, "[a]ny game, fur-bearing animal, fish, reptile, or amphibian" unless owned, confined, or controlled by a person); N.H.Rev.Stat. Ann. § 644:8 (1996 & Supp.1998) (proscribing cruelty to "any animal" and defining "animal" to mean "a domestic animal, a household pet or a wild animal in captivity"); Okla. Stat. tit. 21, § 1685 (Supp.1999) (proscribing cruelty to "any animal in subjugation or captivity, whether wild or tame, and whether belonging to [the accused] or to another"); Tex. Penal Code Ann. § 42.09(c)(1) (West Supp.1999) (defining "animal" in a cruelty to animals statute as "a domesticated living creature and wild living creature previously captured"). A policy decision of this nature should not be second-guessed by the judiciary. The decision to extend the scope of an existing statute to reflect changing values is a matter for the Legislature, and absent an amendment to Section 30–18–1, we presume that the Legislature continues to intend that the statute apply according to its original meaning. In light of the history of cruelty to animals statutes in New Mexico, we believe that the Legislature intended to exclude wild animals from the protections of Section 30–18–1. Because we do not believe that such a result can be characterized as either absurd or unjust under the circumstances surrounding the statute's enactment, we are not persuaded that the Legislature must have had a different intent. *See Aztec Well Servicing Co. v. Property & Cas. Ins., Guar. Ass'n*, 115 N.M. 475, 479, 853 P.2d 726, 730 (1993) ("Our interpretation of the statute must be consistent with legislative intent, and our construction must not render the statute's application absurd, unreasonable, or unjust."). Thus, we conclude that wild game animals, including the deer snared by Cleve in this case, are not covered by Section 30–18–1.

## IV. New Mexico's Game and Fish Laws

{16} Even if we had concluded that wild animals are protected by Section 30–18–1, we believe there are additional indications that the Legislature did not intend that Cleve's conduct in this case fall within the meaning of cruelty to animals in Section 30–18–1. Cleve argues that New Mexico game and fish statutes and regulations preempt the application of Section 30–18–1 to game animals. The Court of Appeals rejected his argument on the basis of a rule of statutory construction, the general/specific statute rule, that has proven somewhat difficult to apply. We take this opportunity to clarify our cases and the proper application of the general/specific statute rule in New Mexico. We agree with Cleve that the overall statutory scheme governing hunting and fishing demonstrates a legislative intent to preempt the application of Section 30–18–1 to game and fish with respect to conduct contemplated by game and fish laws. We believe that the general/specific statute rule therefore provides additional support for our interpretation of Section 30–18–1.

{17} As a rule of statutory construction in determining legislative intent,

> [w]here one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling.

2B Norman J. Singer, *Sutherland Statutory Construction* § 51.05 (5th ed.1992) (footnotes omitted); *accord State v. Blevins*, 40 N.M. 367, 368–69, 60 P.2d 208, 209 (1936). This rule in effect treats the special law as an exception to the general law because the Legislature is presumed not to have intended a conflict between two of its statutes and because the Legislature's attention is more particularly directed to the relevant subject matter in deliberating upon the special law. *See Wilburn v. Territory*, 10 N.M. 402, 408, 62 P. 968, 971 (1900), *overruled sub silencio on other grounds, Tais v. Territory*, 14 N.M. 399, 402–03, 94 P. 947, 948–49 (1908). In the context of criminal laws, this rule of construction has a corollary: if two statutes, one general and one special, punish the same criminal conduct, the special law operates as an exception to the general law "to the extent of compelling the state to prosecute under" the special law. *Blevins*, 40 N.M. at 369, 60 P.2d at 210.

{18} Cleve contends that the unlawful hunting statute, Section 17–2–7, is a special law that conflicts with the general prohibition against cruelty to animals in Section 30–18–1. In discussing this argument, the Court of Appeals concluded that Section 17–2–7 and Section 30–18–1 serve different purposes, are both necessary to fully protect game animals, and, therefore, do not conflict with one another. *Cleve*, 1997–NMCA–113, ¶¶ 7–8, 949 P.2d 672. The Court of Appeals therefore held that the general/specific statute rule did not apply. *Id.* While we believe that the prohibition against unlawful hunting, by itself, does not conflict with Section 30–18–1, we disagree with the Court of Appeals' assessment of the general/specific statute rule. Even if we had concluded that Section 30–18–1 prohibits cruelty against wild animals, we believe that the overall scheme of laws in New Mexico governing hunting and fishing would irreconcilably conflict with Section 30–18–1. Thus, we conclude that the Legislature did not intend for Section 30–18–1 to apply to hunting activities contemplated by New Mexico's specific laws governing game and fish.

{19} Although courts and commentators are readily able to recite the general/specific statute rule, its practical application has caused considerable difficulty. This Court has discussed the rule on several occasions. In *Wilburn*, a defendant, who had stolen a cow, argued that he should have been sentenced pursuant to a general larceny provision, which provided for a value-structured punishment based on the dollar amount of the item stolen, rather than under a statute governing the theft of livestock, which contained a single penalty regardless of the value of the livestock. *Wilburn*, 10 N.M. at 407–08, 62 P. at 970. We concluded that the object of the earlier-enacted statute governing the theft of livestock "was not to prevent larceny in general, but to protect the ownership of a certain class of property," and the statute therefore operated as an exception to the statute defining the general crime of larceny. *Id.* at 409, 62 P. at 971. Subsequently, we relied on the general/specific statute rule in *Blevins* to conclude that the prosecution had improperly charged the defendant under a general statute proscribing the sale of another's property rather than a specific statute governing the sale of cattle. *Blevins*, 40 N.M. at 369–70, 60 P.2d at 210. For determining whether the general/specific statute rule applied, we adopted "[t]he test applied in the United States Supreme Court [in *Blockburger v. United States*, 284 U.S. 299, 303–04, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ] for determining whether the offenses inveighed against are the same or distinct offenses." *Blevins*, 40 N.M. at 369, 60 P.2d at 210. Under this test, the relevant inquiry is whether each provision requires proof of an additional fact that the other does not. *Id.* Applying this test in *Blevins*, we noted that "the possible prejudice to the [defendant] is in the increased penalty" under the general statute proscribing the sale of anoth-

er's property, *id.* at 368, 60 P.2d at 209, and concluded that "the general statute is not operative as to the special kinds of property described in the special statute," *id.* at 369, 60 P.2d at 210.

{20} Our more recent cases have relied on *Blevins* in applying the general/specific statute rule as it affects the charging discretion of the prosecutor. For example, in *Aragon v. Cox*, 75 N.M. 537, 541, 407 P.2d 673, 676 (1965) (per curiam), *overruled on other grounds, State v. Chavez*, 77 N.M. 79, 82, 419 P.2d 456, 458 (1966), we addressed the relationship between a statute specifically proscribing the possession of marijuana and a statute proscribing the possession of a narcotic drug, the latter of which specifically defined marijuana as a narcotic drug. We concluded that the statutes were equally specific and that, therefore, the general/specific rule did not apply. *Id.*[1]

{21} On a number of occasions, this Court has encountered some disagreement in the application of the general/specific statute rule. In *Chavez*, for example, while the majority followed *Aragon* in determining that the two statutes proscribed marijuana possession with equal specificity, two justices dissented because they believed that, under *Blevins*, the more specific statute relating exclusively to marijuana controlled over the statute relating to narcotic drugs in general. *Chavez*, 77 N.M. at 83–85, 419 P.2d at 459–60 (Moise, J., dissenting); *see also State v. Reams*, 98 N.M. 215, 216, 647 P.2d 417, 418 (1982) (reaching a split decision regarding

the application of the general/specific statute rule). More recently, the Court of Appeals again recognized some ambiguities in the application of the general/specific statute rule. *See State v. Wasson*, 1998–NMCA–087, ¶ 19, 125 N.M. 656, 964 P.2d 820 (stating that "it is problematic to discern which of the two statutes is the more specific"), *cert. denied*, 125 N.M. 322, 961 P.2d 167 (1998); *State v. Arellano*, 1997–NMCA–074, ¶ 12, 123 N.M. 589, 943 P.2d 1042 (same), *cert. quashed*, 124 N.M. 589, 953 P.2d 1087 (1998). These cases demonstrate that New Mexico courts frequently resort to the general/specific statute rule as an aid in statutory construction but that the rule is also frequently difficult for courts to apply. As a result, we believe it is necessary to clarify the application of this rule in New Mexico.

{22} Although not explicit in our earlier cases, it is clear that the general/specific statute rule, to the extent that it requires prosecution under one statute instead of another, is connected with the principle of double jeopardy as it relates to multiple punishment for unitary conduct. For example, in *Blevins*, "[w]e start[ed] with the premise that both acts condemn the same offense. A conviction under one statute could be pleaded as a former jeopardy against a subsequent prosecution under the other statute." 40 N.M. at 368, 60 P.2d at 209. Thus, our determination that the Legislature did not intend multiple punishment under the two statutes was a prerequisite to our inquiry under the general/specific statute rule. In-

---

**1.** Although we also concluded in *Aragon* that "the State has a choice in the matter of initiating prosecutions for possession of marijuana" because both statutes "are specific in condemning certain conduct relating to ... marijuana," *Aragon*, 75 N.M. at 541, 407 P.2d at 676, we quickly modified this conclusion in *State v. Chavez*, 77 N.M. 79, 419 P.2d 456 (1966). In *Chavez*, we concluded that, because the two statutes at issue in *Aragon* "condemn the same act" in a specific way, the "view which would permit the law enforcement authorities to subject one person to the possibility of a greater punishment than another who has committed an identical act ... would do violence to the equal protection clauses of our state and federal constitutions." *Id.* at 82, 419 P.2d at 458; *see also People v. Estrada*, 198 Colo. 188, 601 P.2d 619, 621 (1979) (concluding that prosecutorial discretion between two statutes proscribing identical conduct with different

penalties violates state constitutional principles of equal protection). *But see United States v. Batchelder*, 442 U.S. 114, 118–25, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) (concluding that, given Congress's intent that two nearly-identical statutes apply independently, prosecutorial discretion in selective enforcement does not violate the federal Constitution unless it is based on constitutionally impermissible grounds such as race or gender). Thus, we implicitly reaffirmed our conclusion in *Aragon* that the general/specific statute rule does not apply to two equally specific statutes. However, in such a case, if the penalty provisions are different, then the statutes are irreconcilable, and we determined in *Chavez* that the later enactment governing narcotics, including marijuana, implicitly repealed the prior enactment exclusively governing marijuana. *See Chavez*, 77 N.M. at 82, 419 P.2d at 458.

deed, we adopted the test from *Blockburger*, a test developed in the context of multiple punishments, for deciding whether the general/specific statute rule applied. We later applied this test in *State v. Ibn Omar–Muhammad*, 102 N.M. 274, 277, 694 P.2d 922, 925 (1985), in which we discussed the relationship between the crimes of vehicular homicide by reckless driving and depraved mind murder. We determined that depraved mind murder requires proof of an additional fact, a higher level of mental culpability in the element of subjective knowledge that the defendant's act is greatly dangerous to the lives of others, when compared to vehicular homicide and that, therefore, the general/specific rule did not apply. *Id.* at 278, 694 P.2d at 926. In light of the relationship between principles of double jeopardy and the general/specific statute rule, we now clarify our reasoning in *Ibn Omar–Muhammad*.

{23} This Court more recently discussed the principle of double jeopardy in relation to multiple punishments in *Swafford v. State*, 112 N.M. 3, 7–16, 810 P.2d 1223, 1227–36 (1991). We noted that the double jeopardy clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides "limited expectations" to criminal defendants facing multiple convictions and punishments in a single trial arising out of the same criminal conduct. *Id.* at 7, 810 P.2d at 1227. In the context of simultaneously imposed multiple punishments, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). As a result, we acknowledged that "[t]he necessary corollary to the focus on legislative intent is that the *Blockburger* test is not a constitutional rule, but merely a canon of construction used to guide courts in deciphering legislative intent." *Swafford*, 112 N.M. at 9, 810 P.2d at 1229.

■ {24} In *Swafford*, we adopted a two-part test for determining legislative intent to punish. The first part of our inquiry asks . . . whether the conduct underlying the offenses is unitary, *i.e.,* whether the same conduct violates both statutes. The second part focuses on the statutes at issue to determine whether the [L]egislature intended to create separately punishable offenses. Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial.

*Swafford*, 112 N.M. at 13, 810 P.2d at 1233. After describing the relevant considerations for determining whether underlying conduct is unitary, we explained the proper focus in ascertaining legislative intent. First, under the *Blockburger* test, a court should compare the elements of the two offenses, and if the elements of one crime are subsumed within the elements of the other, "the inquiry is over and the statutes are the same for double jeopardy purposes-punishment cannot be had for both." *Swafford*, 112 N.M. at 14, 810 P.2d at 1234. On the other hand, if the elements of the crimes do not correspond,

then the *Blockburger* test raises only a presumption that the statutes punish distinct offenses. That presumption, however is not conclusive and it may be overcome by other indicia of legislative intent. Here, we must turn to traditional means of determining legislative intent: the language, history, and subject of the statutes.

*Id.* Although double jeopardy prevents certain multiple punishments in accordance with legislative intent, it typically does not infringe upon the discretion of the prosecution to charge multiple offenses.

■ {25} Like the double jeopardy inquiry in the multiple punishment context, the general/specific rule is a canon of statutory construction with constitutional overtones. *See Mills v. State*, 722 S.W.2d 411, 413 (Tex. Crim.App.1986) (en banc) ("In the case in which the special statute provides for a lesser range of punishment than the general, obviously an irreconcilable conflict exists, and due process and due course of law dictate that an accused be prosecuted under the special provision, in keeping with presumed legislative intent." (internal quotation marks omitted)). Both analyses focus on legislative intent. However, whereas courts use the principle of double jeopardy in this context to assess the propriety of multiple punishments

by courts based on multiple crimes charged by a prosecutor, courts use the general/specific rule to scrutinize the propriety of a single charge of one crime as opposed to a different crime. Thus, while the double jeopardy inquiry focuses on whether the Legislature intended to limit a court's discretion in imposing multiple punishments, the general/specific statute rule determines whether the Legislature intended to limit the discretion of the prosecutor in its selection of charges.

{26} Accordingly, we reaffirm our reliance on the *Blockburger* test, as the test has been explained in *Swafford*, for determining whether the general/specific statute rule should apply. Courts should compare the elements of the two relevant crimes. If the elements of the two crimes are the same, the general/specific statute rule applies, and the prosecution must charge the defendant under the special law absent a clear expression of legislative intent to the contrary. *See Blevins*, 40 N.M. at 369–70, 60 P.2d at 210; *Wilburn*, 10 N.M. at 407–09, 62 P. at 970–71. If the elements differ, courts must look to other indicia of legislative intent and determine whether the Legislature intended to limit prosecutorial discretion in the selection of charges for the specific criminal conduct. In ascertaining legislative intent, courts should balance the rule of lenity, which favors applying the general/specific statute rule in cases of ambiguity, with the judiciary's longstanding deference to prosecutorial discretion, which favors the exercise of caution before applying the general/specific statute rule. *See State v. Anaya*, 1997–NMSC–010, ¶ 32, 123 N.M. 14, 933 P.2d 223 ("Application of the rule of lenity requires that criminal statutes be interpreted in the defendant's favor when 'insurmountable ambiguity persists regarding the intended scope of [that] statute.'" (quoting *Ogden*, 118 N.M. at 242, 880 P.2d at 853) (alteration in original)); *Ball v. United States*, 470 U.S. 856, 859, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985) ("This Court has long acknowledged the Government's broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case."); *cf. Mitchell v. Superior Court*, 49 Cal.3d 1230, 265 Cal.Rptr. 144, 783 P.2d 731,

743 (1989) (stating that the general/specific statute rule "do[es] not purport to limit the People's discretion to prosecute under a general statute that provides a sanction *less severe* than that called for under a specific statute").

{27} In *Ibn Omar–Muhammad*, 102 N.M. at 277–78, 694 P.2d at 925–26, we focused our inquiry on the elements of the two relevant crimes and determined that the Legislature did not intend to limit prosecutorial discretion due to the clearly distinct behavior each statute sought to prevent and the distinct level of culpability that the Legislature sought to punish. Although we focused our inquiry on the elements of the two relevant crimes, we now clarify that we did not intend to suggest that the elements of the crimes serve as the only relevant factor under the general/specific statute rule. Rather, in conformity with *Swafford*, our application of the general/specific statute rule in *State v. Yarborough*, 1996–NMSC–068, ¶¶ 26–29, 122 N.M. 596, 930 P.2d 131, serves as an example of additional relevant factors in ascertaining legislative intent. In *Yarborough*, we reviewed the history of statutes proscribing homicide by vehicle and involuntary manslaughter in New Mexico. *Id.* ¶¶ 28–29. In addition, we reviewed decisions from other jurisdictions that concluded that "the enactment of a comprehensive motor vehicle code shows a legislative intent to preempt the field." *Id.* ¶ 27. From the history of the statute, we found a similar legislative intent in New Mexico and concluded that the Legislature "intended to preempt involuntary manslaughter when the predicate offense is a misdemeanor contained within the Motor Vehicle Code." *Id.* ¶ 29. Thus, an inquiry under the general/specific statute rule should always focus primarily on whether the Legislature intended that the specific law operate as an exception to the general law and whether the Legislature intended that certain criminal conduct be charged under one special law to the exclusion of other more general laws. This inquiry may include the elements of the crimes, the language of the statutes, the histories and purposes of the statutes, and other relevant indicia of legislative intent. To the extent that *Ibn Omar–Muhammad* might

suggest that we strictly rely on the elements of the crimes in ascertaining legislative intent, *see State v. Tisthammer*, 1998–NMCA–115, ¶ 34, 126 N.M. 52, 966 P.2d 760 (relying on *Ibn Omar–Muhammad* and stating that "if, under the *Blockburger* test, each statute includes an element that the other does not, the general-specific rule is inapplicable"), *cert. denied*, 126 N.M. 107, 967 P.2d 447 (1998); *Wasson*, 1998–NMCA–087, ¶¶ 16–19, 964 P.2d 820 (similar), it is hereby modified in accordance with the reasoning articulated in *Swafford* and the analysis applied in *Yarborough. Cf. People v. Jenkins*, 28 Cal.3d 494, 170 Cal.Rptr. 1, 620 P.2d 587, 592 (1980) (stating that a strict elements test is "incomplete" for determining whether the general/specific statute rule applies).

{28} We note that a determination that the Legislature intended to limit the prosecutor's charging discretion may not fully resolve the matter. As expressed in some recent cases, it may be difficult in some circumstances to determine which of two laws can be characterized as specific and which can be characterized as general. However, this difficulty does not preclude application of the rule or signal that such an inquiry would be futile. As with the interpretation of all statutes, courts should resort to traditional means of ascertaining legislative intent. For example, in *Reams*, Judge Wood of the Court of Appeals, whose dissenting opinion was adopted by this Court, *see Reams*, 98 N.M. at 216, 647 P.2d at 418, reviewed the purpose and history of the Controlled Substances Act, as well as the language of several of its provisions, to conclude that the Legislature focused its attention on criminal drug offenses more particularly in enacting the Controlled Substances Act than in the Drug and Cosmetics Act and that the Legislature intended that the Controlled Substances Act take priority in criminal prosecutions concerning conduct contemplated by the Controlled Substances Act. *See State v. Reams*, 98 N.M. 372, 377–78, 648

P.2d 1185, 1190–91 (Ct.App.1981) (Wood, J., dissenting). Judge Wood's analysis demonstrates that, after determining that the general/specific statute rule applies, traditional rules of statutory construction adequately illuminate which of two statutes the Legislature intends to apply in a particular case.

{29} Applying these principles to the facts of this case, we note that Cleve's focus on the general/specific statute rule in relation to his prosecution for violations of both Section 17–2–7 and Section 30–18–1 is somewhat misplaced. Cleve was convicted of both unlawful hunting and cruelty to animals. Thus, the facts of this case require us to ask, first, whether principles of double jeopardy preclude these multiple convictions. If the Legislature intended to create separately punishable offenses in Section 17–2–7 and Section 30–18–1, double jeopardy would not bar multiple punishments, and we then would not need to engage in an inquiry regarding the application of the general/specific rule to these two statutes because a legislative intent to create multiple punishments necessarily implies that the Legislature also intended to leave intact the prosecutor's charging discretion. If, on the other hand, we conclude that the Legislature did not intend to create separately punishable offenses, then one of Cleve's convictions would be constitutionally invalid, and we would proceed to address the separate matter of whether, under the general/specific statute rule, the Legislature intended that one crime apply to the exclusion of the other.

{30} Under *Swafford*, we look first at the elements of the two crimes in order to determine legislative intent.[2] From a review of these two crimes, it is clear that the elements of unlawful hunting are not subsumed within the crime of cruelty to animals. Unlawful hunting requires proof that a defendant hunted, took, captured, or killed any game animal, game fish, or game bird, or attempted the same, in a manner not permitted by game and fish regulations or some other law.

---

**2.** At oral argument, the State suggested that double jeopardy would not apply in this case because the underlying conduct for the crimes was not unitary. The State asserted that Cleve committed unlawful hunting by simply setting the snares but did not commit cruelty to animals until the

animals were actually caught. Because the State relied on the actual snaring of the deer for both crimes in the trial court, and in fact chose not to prosecute Cleve for setting a snare that did not trap any animals, we assume the underlying conduct was unitary for purposes of this inquiry.

Section 17–2–7. Specifically, the State relied on the fact that snaring is not an authorized manner for taking deer pursuant to State Game Commission (Commission) regulations. By contrast, cruelty to animals requires proof that a defendant tortured or cruelly killed an animal. *Cf. State v. Carrasco,* 1997–NMSC–047, ¶ 27, 124 N.M. 64, 946 P.2d 1075 ("Both offenses are defined by statutes providing several alternatives, thus we focus on the legal theory of the case and disregard any inapplicable statutory elements."). As a result, if we had concluded that Section 30–18–1 applies to wild animals, the unique elements of torture or cruelty in Section 30–18–1 and of violation of the Commission's regulations in Section 17–2–7 would raise a presumption that the Legislature intended to create separately punishable offenses. Thus, we turn to traditional means of discerning legislative intent in order to determine whether the presumption stands.

{31} In this context, we ask whether the violation of one statute will normally result in a violation of the other. *See Swafford,* 112 N.M. at 14, 810 P.2d at 1234; *see also Jenkins,* 170 Cal.Rptr. 1, 620 P.2d at 592 (stating that the general/specific statute rule applies "[i]f it appears from the entire context that a violation of the 'special' statute will necessarily or commonly result in a violation of the 'general' statute"). As the Court of Appeals noted, if Section 30–18–1 were to protect wild animals, it would be possible to violate each statute, cruelty to animals and unlawful hunting, independently, without violating the other. *Cleve,* 1997–NMCA–113, ¶ 8, 949 P.2d 672. For example, many hunters could be convicted of unlawful hunting for killing game without a license, or out of season, and yet fail to satisfy the elements of cruelty to animals. Thus, even if Section 30–18–1 had protected wild animals, the violation of one of these statutes would not commonly result in violation of the other. Further, in assessing "the particular evil sought to be addressed by each offense," and bearing in mind that the description of "social evils can be elusive and subject to diverse interpretation," *Swafford,* 112 N.M. at 14, 810 P.2d at 1234, we agree with the Court of Appeals that these statutes serve different purposes. *Cleve,* 1997–NMCA–113, ¶¶ 7–8, 949 P.2d 672. As

we have already stated, the cruelty to animals statute serves to define the outer boundaries of acceptable human conduct toward animals. By contrast, the unlawful hunting statute serves to enforce the authority of the Commission in defining the manner and conditions of lawful hunting and fishing in New Mexico and to ensure that hunting and fishing in New Mexico is carried out in a manner consistent with the public policy articulated in NMSA 1978, § 17–1–1 (1931).

> It is the purpose of this act and the policy of the state of New Mexico to provide an adequate and flexible system for the protection of the game and fish of New Mexico and for their use and development for public recreation and food supply, and to provide for their propagation, planting, protection, regulation and conservation to the extent necessary to provide and maintain an adequate supply of game and fish within the state of New Mexico.

*Id.* Taking into account such statutory factors as language, history, and purpose, we conclude that the Legislature intended to create separately punishable offenses by enacting Section 17–2–7 and Section 30–18–1. Thus, we conclude that, if Section 30–18–1 had protected wild animals from cruelty, double jeopardy would not prevent convictions for both of these crimes, and we therefore need not address the application of the general/specific statute rule in the limited context of prosecutorial discretion in charging one of these crimes instead of the other.

{32} Notwithstanding a lack of conflict between the statutory prohibition against unlawful hunting, by itself, and Section 30–18–1, Cleve also asserts that the overall statutory scheme governing hunting and fishing demonstrates a legislative intent to preempt the application of Section 30–18–1 to game and fish with respect to conduct contemplated by game and fish laws. We agree. As outlined above, the general/specific statute rule is broader in application than determining only the potential limits on prosecutorial discretion in charging one crime instead of another. This rule of construction assists courts more generally in determining whether the Legislature intended to create an exception to a general statute by enacting

another law dealing with the matter in a more specific way. Although the limited proscription against unlawful hunting, standing alone, does not conflict with Section 30–18–1, we conclude that New Mexico's other laws specifically governing hunting and fishing irreconcilably conflict with Section 30–18–1 and that behavior contemplated by the Legislature's authorization of hunting and fishing is excepted from the general proscription against cruelty to animals.

{33} The Legislature has established in New Mexico a system under which game and fish may be "use[d] and develop[ed] for public recreation and food supply." Section 17–1–1. In order to implement this system, the Legislature created the Commission, NMSA 1978, § 17–1–2 (1991), and delegated to it, among other things, the power to "authorize or prohibit the killing or taking of any game animals, game birds or game fish of any kind or sex" and the power to regulate "the manner, methods and devices which may be used in hunting, taking or killing game animals, game birds and game fish," NMSA 1978, § 17–2–1 (1983). The Commission's regulations include provisions governing the hunting of deer, as well as provisions establishing the proper use of traps and snares.

{34} Cleve's cruelty to animals convictions are based on the snaring of two deer. In placing his snares, it is clear that Cleve was engaged in the activity of hunting the deer on his land and that his manner of hunting, trapping by snare, is within the range of hunting activity contemplated by the game and fish statutes. We believe that Cleve's conviction of cruelty to animals for snaring game animals exemplifies the conflict between Section 30–18–1 and the Legislature's provisions governing hunting and fishing in New Mexico. Although the Commission's regulations do not authorize the capturing of deer by snare, see Legal Sporting Arms and Ammunition, Department of Game and Fish, 19 NMAC 31.1.16.4 (April 1, 1995), the Commission has promulgated regulations authorizing the snaring and trapping of furbearing game animals within certain parameters, see Manner and Method of Taking Furbearers, Department of Game and Fish, 19 NMAC 32.1.10 (April 1, 1995). The

language of Section 17–2–1 clearly delegates to the Commission the power to determine whether the snaring of particular game animals is consistent with the statutory purposes articulated in Section 17–1–1. It appears from the evidence introduced in the trial court that the manner of death for the two snared deer, strangulation and either starvation, dehydration, or fatigue, is not atypical for a snared game animal. Thus, under the Court of Appeals' interpretation of Section 30–18–1, the lawful snaring of furbearing animals would appear to be equally subject to prosecution for cruelty to animals. Further, a Department official, Assistant Chief of Operations Pat Barncastle, testified that, when the Department traps antelope and deer for purposes such as relocation, it is not uncommon for them to die of stress-related fatigue. This activity would also appear to violate the cruelty to animals statute under the Court of Appeals' construction. Additionally, the State charged Cleve with cruelty to animals for shooting several deer in the abdomen, even though Officer Barncastle testified that approximately twenty-five to thirty-five percent of deer lawfully taken pursuant to Commission regulations are also shot in the abdomen. Thus, according to the State's interpretation of Section 30–18–1, the lawful hunting of deer would appear to subject a hunter to potential prosecution for cruelty to animals. We believe that these applications of Section 30–18–1 would conflict with the Legislature's authorization of hunting and fishing in New Mexico and would frustrate the Legislature's delegation of power to the Commission to determine the manner in which hunting is to be conducted.

{35} Although Cleve's conduct violated Commission regulations, thereby constituting unlawful hunting, it was not beyond the scope of activity that the Legislature has chosen to place within the regulatory power of the Commission. In fact, the Legislature has recently addressed the specific problems arising in this case, providing that landowners may, in accordance with Commission regulations, take a game animal on private land if the animal "presents an immediate threat to human life or an immediate threat of damage to property, including crops." NMSA 1978, § 17–2–7 .2 (1997). Thus, we

determine that the Legislature's endorsement of hunting and fishing activity and its delegation of power to the Commission to determine the manner of hunting substantially and irreconcilably conflicts with the cruelty-to-animals statute. Therefore, we conclude that, even if the Legislature had intended to protect wild animals in Section 30–18–1, the Legislature, having dealt with the subject of the hunting of game animals more particularly in the game and fish laws, intended to create an exception from the cruelty-to-animals statute for hunting and fishing activity contemplated by game and fish laws.

{36} Like the comprehensive Motor Vehicle Code addressed in *Yarborough*, 1996–NMSC–068, ¶¶ 27–29, 930 P.2d 131, we believe the comprehensive nature of the game and fish laws with respect to hunting activity demonstrates a legislative intent to preempt application of Section 30–18–1 to the hunting of game animals. Because Cleve was engaged in the hunting of game animals, specifically deer, and because his manner of hunting was within the range of activity contemplated by game and fish statutes and regulations, we apply the general/specific statute rule and conclude that Section 30–18–1 is inapplicable to the facts of this case.

### V. Conclusion

{37} Section 30–18–1 prohibits various forms of cruelty to "any animal." We believe that the Legislature intended the phrase "any animal" to mean domestic animals and wild animals in captivity. As a result, we conclude that Section 30–18–1 does not apply to Cleve's conduct of snaring two deer. Further, even if the Legislature had intended to protect wild animals in Section 30–18–1, we conclude that New Mexico's laws governing hunting and fishing preempt the application of Section 30–18–1 to the taking of deer by Cleve in this case. Therefore, we reverse Cleve's convictions for cruelty to animals.

{38} **IT IS SO ORDERED.**

MINZNER, C.J., BACA and FRANCHINI, JJ., concur.

1999-NMSC-016