2002-NMCA-013

39 P.3d 739

Yvette LUCERO, individually and as parent and next best friend of Luke Lucero and Isaac Lucero, minors, and Michael J. Lucero, Plaintiffs–Appellants,

v.

RICHARDSON & RICHARDSON, INC.; Wright & Hammer Architects; Albuquerque Public Schools; and John Does 1–15, Defendants–Appellees.

No. 21,816.

Court of Appeals of New Mexico.

Dec. 13, 2001.

Certiorari Denied, No. 27,288, Jan. 29, 2002.

Linda J. Rios, Kathleen D. Carter, Carter Law Firm, P.C., Albuquerque, NM, for Appellants.

Michael L. Carrico, Max J. Madrid, Elizabeth A. García, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, for Appellees.

*OPINION*

PICKARD, Judge.

{1} Plaintiffs appeal from the district court's grant of summary judgment in favor of the Defendant Albuquerque Public Schools. Plaintiff Yvette Lucero was injured when she tripped and fell on the grounds of the Apache Elementary School, where she had been watching her son's Little League game. Lucero, her husband, and their two children filed suit for damages, claiming Defendant had waived its immunity from liability under the Tort Claims Act, NMSA 1978, §§ 41–4–1 to 27 (1976 as amended through 2001). Defendant filed a motion for summary judgment, asserting that it was immune from liability under the Recreational

Use Statute, NMSA 1978, § 17–4–7 (1967), which limits the liability of landowners who allow the public to use their land free of charge for recreational purposes. The trial court granted summary judgment. We hold that the Recreational Use Statute (RUS) does not provide immunity for organized team sports such as Little League baseball. Accordingly, we reverse.

**FACTS AND PROCEEDINGS**

{2} Ms. Lucero tripped and fell while walking from her truck to the spectator area of the school ballfield. Plaintiffs filed suit against Defendant to recover damages for Ms. Lucero's injuries. They allege that the school was negligent because it allowed construction workers to leave the school grounds in a dangerous condition and that Defendant can be held liable under Section 41–4–6, which waives sovereign immunity for the operation and maintenance of public buildings and their grounds. Defendant moved for summary judgment, contending that the RUS controls the outcome of this case. The RUS limits the liability of

*[a]ny owner,* lessee or person in control of lands who, without charge or other consideration, other than a consideration paid to said landowner by the state, the federal government or any other governmental agency, grants permission to any person or group to use his lands for the purpose of hunting, fishing, trapping, camping, hiking, sightseeing *or any other recreational use*
. . . .

Section 17–4–7(A) (emphasis added). Defendant argued that this statute protects APS from liability in this case because APS allows Zia Little League to use the field at Apache Elementary School free of charge. In response, Plaintiffs argued that the statute, though written with no limitation, applies only to privately held land. Plaintiffs also argued that the Little League baseball is not the type of activity that triggers the statutory protection and that the statute is inapplicable in this case because the school was charging a fee for the use of its land. Finally, they argued that the application of the statute to public lands would violate equal protection because it would create differential treatment for similarly situated tort vic-

tims. The trial court, rejecting all Plaintiffs' arguments, granted summary judgment for Defendant. Plaintiffs raise all but the equal protection argument on appeal.

## DISCUSSION

{3} Because we hold that the protections of the RUS apply only when landowners allow free public access for a limited range of outdoor activities, and that organized team sports such as Little League baseball do not fall within that range of activities, we need not decide the more difficult question of whether the statute applies to public as well as private landowners. Nonetheless, we pause to address this issue because the parties have exposed a gap in our statutory scheme, one that could impact the extent of government tort liability in this state. We seek to clarify the issue as presented so that the legislature, if it sees fit, can fill in this gap rather than leaving it to the courts to make what may appear to be tortured efforts at statutory interpretation.

*Background of the Recreational Use Statute*

{4} The Recreational Use Statute, like many of the statutes passed by our legislature, was adapted from an external source. In 1965, the Council of State Governments published a model statute that proposed limits on the liability of landowners who allow the public to use their land at no charge. *See Public Recreation on Private Lands: Limitation on Liability*, 24 Suggested State Legislation 150 (1965) (hereinafter "MODEL STATUTE"). At that time, approximately one-third of the states had adopted legislation limiting landowner liability in this fashion. *Id.* Following its publication, several states adopted the proposed statute verbatim. *See Rivera v. Philadelphia Theological Seminary*, 510 Pa. 1, 507 A.2d 1, 8–9 n. 18 (1986) (listing states in addition to Pennsylvania that had adopted proposed statute without alteration). New Mexico passed a modified version in 1967. As of 1988, 48 states had statutes providing some form of limited liability for landowners who open their lands for public use. *See Redinger v. Clapper's Tree Serv., Inc.*, 419 Pa.Super. 487, 615 A.2d 743, 745 (1992).

{5} The commentary to the Model Statute makes it clear that the drafters were focusing on private land:

> Recent years have seen a growing awareness of the need for additional recreational areas to serve the general public. The acquisition and operation of outdoor recreational facilities by governmental units is on the increase. However, large acreages of private land could add to the outdoor recreation resources available.... [I]n those instances where private owners are willing to make their land available to members of the general public without charge, it is possible to argue that every reasonable encouragement should be given to them.

> . . .

> The suggested act which follows is designed to encourage availability of private lands by limiting the liability of owners to situations in which they are compensated for the use of their property....

MODEL STATUTE at 150.

{6} The Model Statute itself, however, provides immunity for "owners of land" without any express limitation to private, as opposed to public, landowners. The Model Statute defines the term owner, somewhat inaccurately, as "the possessor of a fee interest, a tenant, lessee, occupant or person in control of the premises," again without express limitation to private landowners. New Mexico's statute similarly limits the liability of "[a]ny owner, lessee or person in control of lands" without reservation. Section 17–4–7(A).

{7} Defendant urges a plain meaning analysis of the statutory language, arguing that the phrase "any owner" includes government entities when they own land. Plaintiffs, on the other hand, urge us to look at the intent behind the statute and the context in which it was passed. Most notably, at the time the RUS was passed, governmental bodies enjoyed full immunity from suit under the common law doctrine of sovereign immunity. They bore no liability for injuries occurring on their land and therefore had no need for the protection offered under the statute. The legal landscape changed in 1975, however, when our Supreme Court abolished com-

mon law sovereign immunity, *see Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1975), and again in 1976, when the legislature passed the Tort Claims Act, reinstating the government's immunity generally but waiving immunity in eight specific circumstances. *See* §§ 41–4–5–to–12. This case raises the question of how the RUS should be interpreted in light of modern circumstances, where government entities now face liability for injuries occurring on land that they own.

### The RUS is Unclear as to Whether it Applies to State Lands

{8} To decide this issue, we would need to determine whether this is a case where we should apply a strict plain meaning analysis, or whether we should look beyond the words of the statute and consider the intent of the legislature that passed it. Interpretation of a statute is a question of law that is reviewed de novo. *State v. Rowell*, 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995). Our goal in interpreting a statute is to give effect to the intent of the legislature. *In re Extradition of Martinez*, 2001–NMSC–009, ¶ 14, 130 N.M. 144, 20 P.3d 126. Plain meaning is the primary indicator of legislative intent. *Mem'l Med. Ctr., Inc. v. Tatsch Constr., Inc.*, 2000–NMSC–030, ¶ 27, 129 N.M. 677, 12 P.3d 431. Our Supreme Court, however, has advised that

> courts must exercise caution in applying the plain meaning rule. Its beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning. As a result, we must examine the context surrounding a particular statute, such as its history, its apparent object, and other statutes in pari materia, in order to determine whether the language used by the Legislature is indeed plain and unambiguous.

*State v. Cleve*, 1999–NMSC–017, ¶ 8, 127 N.M. 240, 980 P.2d 23 (internal quotation marks and citations omitted), *modified on other grounds by State v. Guilez*, 2000–NMSC–020, 129 N.M. 240, 4 P.3d 1231.

{9} In this case, there is a legitimate difference of opinion as to whether the phrase "any owner" should be construed to include government entities when the statute would not have applied to public lands at the time it was passed. The differences of opinion on this issue are dramatically illustrated by the split of authority among jurisdictions that have grappled with the same question. "In spite of its conciseness and apparent simplicity, [the RUS] has managed to weave a tortured tapestry of decisional law in a multitude of jurisdictions in which it has been enacted." *Redinger*, 615 A.2d at 746. Many jurisdictions, like New Mexico, adopted their recreational use statutes while their state governments still enjoyed sovereign immunity, and most states, like New Mexico, subsequently modified the law to allow suits against the government in at least limited circumstances. Thus, many other states similarly have RUS provisions that apply obliquely to "owners of land," without specific language indicating whether that includes government entities or only private landowners. These courts, for a variety of reasons, have come to opposite conclusions on the question of whether that phrase includes government entities. Those jurisdictions extending the RUS's protections to public lands note that nothing in the statutory language limits the application to private lands. *See, e.g., Kimsey v. City of Myrtle Beach*, 109 F.3d 194, 196 (4th Cir.1997). Jurisdictions limiting the statute's reach to private landowners have focused more on the intent of the legislature passing the statute. *See, e.g., Conway v. Wilton*, 238 Conn. 653, 680 A.2d 242, 253 (1996). In addition, some state legislatures have modified the language of the RUS to specify whether or not limited liability provisions in the RUS extend to the public sector. *Compare* 745 Ill. Comp. Stat. 65/2(b) (2000) (" 'Owner' includes the possessor of any interest in land, whether it be a tenant, lessee, occupant, *the State of Illinois and its political subdivisions*, or person in control of the premises.") (emphasis added), *with* Haw. Rev.Stat. § 520–2 (1993) (" 'Land' means land, roads, water, water courses, private ways and buildings, structures, and machinery or equipment when attached to realty,

*other than lands owned by the government.")* (emphasis added).

{10} We could adopt the reasoning of any of these courts to decide the question at hand. We could turn also to a number of canons of construction. For example, our courts have held that statutes, when expressed in general terms, will apply to changing conditions. *See Ashbaugh v. Williams,* 106 N.M. 598, 599, 747 P.2d 244, 245 (1987). Applying this principle, we could say that liability protections available to private landowners in 1965 would naturally extend to public landowners once they became subject to tort liability. On the other hand, there are a number of principles that would lead to the opposite conclusion. First, our courts have held that a statute is to be interpreted as the legislature understood it at the time of enactment. *State v. Morrison,* 1999 NMCA 041, ¶ 9, 127 N.M. 63, 976 P.2d 1015. Since the legislature that passed the RUS would not have understood the statute to impact the liability of public landowners, we could decline to extend the statute beyond its original meaning. In addition, the RUS is a statute in derogation of the common law, limiting the common law right of tort victims to seek compensation from tortfeasors. As such, we could adopt the narrower of the alternative constructions, resolving ambiguity against a legislative intent to deny citizens those rights.

{11} Also, absent express words to the contrary, neither the state nor its subdivisions are included within general words of a statute. *See Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 780, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (holding that the provisions of the False Claims Act allowing suit imposing liability on "any person" who presented false claims to the federal government did not allow suits against state governments); *Borgen v. Fort Pitt Museum Assocs.,* 83 Pa. Cmwlth. 207, 477 A.2d 36, 39 (1984) (applying state statute to public lands), *overruled by Pennsylvania Dep't of Envtl. Res. v. Auresto,* 511 Pa. 73, 511 A.2d 815, 816–17 (1986). Our courts cited this proposition the very year the legislature passed the RUS, providing some evidence that the legislature would not have understood the word "owner" to include government entities, even if they were subject to tort liability at the time. *See State ex rel. State Highway Comm'n v. City of Aztec,* 77 N.M. 524, 526, 424 P.2d 801, 803 (1967) (holding that constitutional provision requiring municipalities to pass an ordinance in order to incur debt applied to debt to the state as well as private entities but acknowledging the canon of construction that "a sovereign is presumptively not intended to be bound by its own statute unless included by the clearest implication"); *see also S. Union Gas Co. v. N.M. Pub. Serv. Comm'n,* 82 N.M. 405, 406, 482 P.2d 913, 915 (1971) ("When the legislature has wanted to include sovereigns or other governmental bodies in its statutes, it has known how to do so."), *overruled on other grounds by De Vargas Sav. & Loan Ass'n v. Campbell,* 87 N.M. 469, 471, 535 P.2d 1320, 1322 (1975). The provisions of the RUS apply to "[a]ny owner, lessee or *person* in control of lands who . . . grants permission . . . for use of *his* land. . . ." If we were to interpret the word owner to include the state, but the word person to exclude the state, then the statute would apply to government entities only when they owned land, but to private entities when they either owned or controlled lands. It seems unlikely the drafters intended such an awkward construction. In addition, the use of the word "his" supports a construction of the word owner in the same manner we would construe the word person.

{12} Though these tools of statutory interpretation provide some guidance, there is no overwhelming evidence as to whether or not the statute was meant to extend to publicly held land under these circumstances. Because we need not decide the question today, we take this opportunity only to make the legislature aware of the possible interpretations of the statute, so that if the legislature sees fit, it can amend the statute to demonstrate its true intent.

*The Tort Claims Act's Preemption of the Application of the RUS to Public Lands*

{13} Even if we were to read the word "owner" in the RUS to include government public entities, we would still need to deter-

mine the impact of the Tort Claims Act. Defendant argues that public entities may assert the defense available under the RUS even in situations where the Tort Claims Act waives sovereign immunity. To support its argument, Defendant points to Section 41-4-14, which authorizes government entities to assert any defense available under New Mexico law. Under such a construction, however, municipal governments across the state would be immune from liability for injuries occurring in any park open to the public free of charge, even though the Tort Claims Act expressly waives immunity for public parks. Tort victims would only have the right to sue public entities for injuries occurring in public parks when there is a fee for admission. It would be unusual for our legislature to have taken such an indirect and underhanded route to avoid liability when it had the more direct and obvious option of maintaining its immunity for public parks and building within the Tort Claims Act. "It is . . . unlikely that the Legislature, had it desired to confer immunity . . . would do so by such an imprecise, indefinite and indistinct vehicle as a statute limiting the liability of the 'owners of land.' " *Borgen*, 477 A.2d at 39.

{14} As a result, Plaintiffs' argument that the Tort Claims Act preempts the application of the RUS would seem to be more compelling. In passing the Tort Claims Act, "the Legislature's attention [was] more particularly directed to the relevant subject matter" of governmental liability for torts upon public land. *Cleve*, 1999–NMSC–017, ¶ 17, 127 N.M. 240, 980 P.2d 23. The Tort Claims Act is also the most recent expression of legislative intent as to the extent of governmental liability. *See Abbott v. Armijo*, 100 N.M. 190, 191, 668 P.2d 306, 307 (1983) ("[A] later statute, as the most recent expression of legislative intent, will control over an earlier statute to the extent of any inconsistency."). Under this construction of the two statutes, however, the RUS would only apply to public landowners when its protections are not needed-when the government is already protected from suit by sovereign immunity. This would have been equally true, however, before the abrogation of sovereign immunity, when the RUS may have technically been applicable to public lands, but the government would have had no need to rely on its protections since it was protected by its broader sovereign immunity.

{15} Defendant proposes an alterative construction, one that would apply the RUS only to public lands that are not already open to the public, and the public entity therefore has discretion whether to allow public use or not. Immunity would then be limited to those few instances where a public entity allows recreational users onto land that would otherwise be unavailable to them. This interpretation has some appeal, in that the goal of the statute was to open land to the public that was otherwise unavailable. Some states have taken this approach. *See Sena v. Town of Greenfield*, 91 N.Y.2d 611, 673 N.Y.S.2d 984, 696 N.E.2d 996, 999 (1998) ("Where a municipality has already opened land for supervised recreational use, the statute's intended purpose of encouraging the landowner to make its property available for public use would not be served."). This is also the construction the district court seemed to adopt. Where a public entity has discretion as to whether or not to allow public access, the statutory protection may provide needed incentive to encourage that entity to open up its land for public use, just as it does for private landowners. On the other hand, for lands that are dedicated for public use, such as parks, the government is not free to prevent public access.

{16} Nothing in the RUS, however, limits its application to land that was not otherwise open to the public. Certainly a landowner who allowed the free public access to land for recreational use before the passage of the statute would be entitled to its protections. If there is such a limitation on the application to public lands, it is not found in the words of the statute. In addition, the passing legislature never considered such an application of the statute to the status of public land. This Court would risk imposing its own policy judgments by adopting such a construction.

{17} We have some doubts, therefore, as to whether the RUS protects government entities from liability. We do not decide that question today, however, because we conclude that the RUS extends only to a limited

range of activities, and that organized team sports such as Little League baseball are not included within that range of activities.

*The Protections of the RUS Do Not Extend to Activities Such as Little League Baseball*

{18} The RUS limits the liability of landowners who allow the public to use their land for "hunting, fishing, trapping, camping, hiking, sightseeing or any other recreational use." Section 17–4–7(A). Defendant urges a broad interpretation of the phrase "any other purpose," and therefore argues the statute applies to any type of recreational activity. In this instance, however, we do not believe a broad interpretation is warranted. We have long followed the doctrine of ejusdem generis. "[W]here general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." *State v. Foulenfont,* 119 N.M. 788, 791, 895 P.2d 1329, 1332 (Ct. App.1995) (quoting *State v. Bybee,* 109 N.M. 44, 46, 781 P.2d 316, 318 (Ct.App.1989)). In applying this doctrine, we look to the specific terms employed and seek the common characteristics among them, excluding anything that does not share those characteristics. *See Hartman v. Texaco,* 1997 NMCA 032, ¶ 10, 123 N.M. 220, 937 P.2d 979. In *Hartman,* for example, in interpreting the language "buildings, structures, trees, shrubs or other natural features," we determined that other natural features included only aboveground, not subsurface, features, since all the features listed existed above ground. *Id.*

{19} In the RUS, none of the listed activities are organized, competitive team sports. They are activities pursued in wilderness areas or "the true outdoors," a phrase some other jurisdictions have employed as a descriptive term. *See Adams v. Louisiana,* 525 So.2d 55, 57 (La.Ct.App.1988); *Boileau v. De Cecco,* 125 N.J.Super. 263, 310 A.2d 497, 499–500 (App.Div.1973). While this might not be the most artful description, we think the distinction is clear. It is the difference, for example, between those activities covered by *Outside Magazine* and those discussed in *Sports Illustrated.* The activities listed in the statute can be pursued alone, or in small groups. They are activities that allow people to enjoy the far-ranging beauty of our state on their own time and at their own pace. They are not activities that require scorekeepers, coaches, or uniforms. They are not activities that start at a set time in a set place or that are governed by an extensive set of rules.

{20} We do not see the list of activities included in the statute as broad enough to encompass every leisure activity enjoyed outdoors. We think Plaintiffs correctly note that if the legislature had wanted the statute to apply generally to any recreational activity, it would have been unnecessary to list the six activities included in the statute, rendering those words surplusage. We also agree with Plaintiffs that the legislature would not have needed to pass the Off Highway Motor Vehicles Act, NMSA 1978, § 66–3–1013 (1985), a similar statute providing immunity to landowners who allow access to off-highway vehicles, if the RUS could be read so broadly.

{21} Our limited construction of the phrase "recreational activities" is also supported by the statute's placement within the Game and Fish Acts. Nothing else in those statutes regulates baseball or any other team sport, while several of the statutes address the specific activities listed in the RUS. We also note that our legislature adopted a more narrow list of recreational activities than included within the Model Statute, eliminating swimming, boating, picnicking, pleasure driving, nature study, waterskiing, and winter sports, while adding only trapping. *Compare* § 17–4–7, *with* MODEL STATUTE at 151. We find it difficult to infer legislative intent to adopt a broad interpretation when the legislature acted to narrow the activities included within the purview of the statute.

{22} Defendant points us to case law from jurisdictions that have specifically found baseball, softball, and even T-ball to be recreational activities within the meaning of their recreational use statutes. Two of the cases Defendant cites are inapplicable. Defendant cites to a case from South Carolina, but that state's statute includes summer

sports among the listed recreational activities. *See* S.C.Code Ann. § 27–3–20(c) (1991). The South Carolina Court found that the statutory language "invites judicial expansion." *Brooks v. Northwood Little League, Inc.*, 327 S.C. 400, 489 S.E.2d 647, 651 (App. 1997). The same cannot be said for New Mexico's statute. In addition, in the case Defendant cites from Idaho, *Ambrose v. Buhl Joint School District No. 412*, 126 Idaho 581, 887 P.2d 1088, 1090–92 (App.1994), even though the activity involved was T-ball, the only question before the court was the extent of trespasser liability. *See id.*

{23} In the other two cases cited by Defendant, the courts read statutory language similar to ours broadly enough to encompass baseball. *See Cunningham v. Bakker Produce, Inc.*, 712 N.E.2d 1002, 1006 (Ind.Ct. App.1999); *LiCause v. City of Canton*, 42 Ohio St.3d 109, 537 N.E.2d 1298, 1300 (1989). We simply disagree with this construction. A number of other jurisdictions have similarly rejected an expansive view of the statutory list of activities. Some have specifically excluded baseball or softball. *See, e.g., Torres v. City of Bellmead*, 40 S.W.3d 662, 665 (Tex. Ct.App.2001) (excluding baseball from the purview of the statute because the statutory list of activities did not include competitive team sports); *Johnson v. Rapid City Softball Ass'n*, 514 N.W.2d 693, 695–96 (S.D.1994) (excluding softball where the legislature included winter but not summer sports). Others have more generally applied the ejusdem generis doctrine to limit the scope of the statute to outdoor recreational activities. *See, e.g., Herman v. City of Tucson*, 197 Ariz. 430, 4 P.3d 973, 977–78 & n. 1 (App.1999); *Matthews v. Elk Pioneer Days*, 64 Wash. App. 433, 824 P.2d 541, 543–44 (1992). Some jurisdictions have imposed similar limits on the scope of the statute by focusing on the type of land, rather than the type of activity. *See, e.g., Redinger*, 615 A.2d at 749 (extending statutory protection only to unimproved land); *Boland v. Nevada Rock & Sand Co.*, 111 Nev. 608, 894 P.2d 988, 991 (1995) (limiting application of statute to rural, open land). Our focus today, however, is on the types of activities covered by the statute, not the types of land, although we doubt that people injured playing catch, or even an informal game of baseball, on a camping trip would be able to recover under the reasoning of our opinion. *Cf. Cunningham*, 712 N.E.2d at 1006.

{24} There is no doubt that baseball is a recreational activity in the sense that it is "pursued ... for the pleasure or interest it gives." 2 New Shorter Oxford English Dictionary 2508 (4th ed.1993). Recreational team sports provide countless benefits to children and adults alike. From our reading of the statute, however, we cannot discern a legislative intent to include such activity within the purview of the RUS. Courts in other jurisdictions have speculated as to the reason for this legislative choice. The owners of large, remote tracts of land would face a heavy burden if required to inspect, monitor and maintain their lands sufficiently to prevent injuries. *See Monteville v. Terrebonne Parish Consol. Gov't*, 567 So.2d 1097, 1104 (La.1990) (limiting the application of Lousiana's statute to activities pursued in the true outdoors). In contrast, when an owner of land installs equipment or makes improvements to the land, making it suitable for more organized recreational activities that take place within a limited area, its users may expect that the premises will be properly maintained and inspected. *See id.; Redinger*, 615 A.2d at 748. In addition, the policy behind the RUS was to open "large acreages of private land" for public use without having to invest public resources for the acquisition of lands. Model Statute at 150. There is no evidence that the legislature was equally concerned about either a shortage of baseball diamonds or other sporting facilities within urban areas or about governmental expenditures to acquire ballfields. Defendant's argument that the statute should be expanded to cover recreational sports because they have become increasingly popular is equally unpersuasive. We will not judicially expand a thirty-four year old statute because sporting activities have become more popular. That decision is left to the legislature.

{25} Because we hold that the RUS does not apply when a landowner provides access for *organized team sports*, we need not address Plaintiffs' arguments that the fee the

**530**

Luceros paid to Zia Little League constitutes a "charge" for the purposes of the statute and that the Defendant would still owe a duty of care to Ms. Lucero as a trespasser under the RUS.

**CONCLUSION**

{26} We hold only that New Mexico's Recreational Use Statute, Section 17–4–7, does not extend to organized team sports. As a result, Defendant did not enjoy immunity from liability for any injuries occurring on its land when it allowed a Little League baseball team to use its fields free of charge. We therefore reverse the district court's grant of summary judgment in favor of APS and remand this case to the district court for further proceedings. Although we cast some doubt on the merits of Defendant's argument that the protections offered by the RUS extends to government entities as landowners, we discuss this issue only to alert the legislature to an apparent gap within this state's statutory scheme.

{27} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Judge and IRA ROBINSON, Judge.