**Certiorari Granted, October 18, 2010, Docket No. 32,603**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-091**

**Filing Date: July 19, 2010**

**Docket No. 29,149**

**DANNY HOLGUIN,**

> **Plaintiff,**

**v.**

**FULCO OIL SERVICES L.L.C.,**
**3-K OIL AND GAS SERVICES, L.L.C.,**

> **Defendants/Appellees.**

**SOUTHERN UNION GAS SERVICES, LTD.,**

> **Defendant/Third-Party Plaintiff/Appellant,**

**v.**

**RUTH ELKINS d/b/a PROJECTS, ETC.,**

> **Third-Party Defendant/Appellee.**

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Anna E. McDowell
Larry D. Beall
Albuquerque, NM

for Appellee Fulco Oil Services, L.L.C.

Madison, Harbour & Mroz, P.A.
Robert J. Mroz
Jennifer L. Collins
Albuquerque, NM

1

for Appellee 3-K Oil and Gas Services, L.L.C.

Scott Hulse P.C.
R. Glenn Davis
Michael D. Stell
El Paso, TX

for Appellant Southern Union Gas Services, Ltd.

Law Office of Paul S. Grand
Paul S. Grand
Santa Fe, NM

for Appellee Ruth Elkins

## OPINION

**VANZI, Judge.**

**{1}**     At issue in this appeal is the scope and interpretation of New Mexico's oilfield and construction anti-indemnity statutes. Appellant appeals the district court's grant of summary judgment in favor of Appellees. The district court held that the indemnity clauses in the service contracts between Appellant and Appellees whereby Appellees agreed to indemnify Appellant against all claims, even where the claim was based in part on the negligence of the Appellant, were in violation of New Mexico's oilfield and construction anti-indemnity statutes and were, therefore, void as against public policy. We reverse in part and affirm in part.

## BACKGROUND

**{2}**     The following facts are not in dispute. Appellant, Southern Union Gas Services, Ltd. (Southern Union) owns and operates a gas processing facility in Lea County, New Mexico. Appellees, Fulco Oil Services, L.L.C., 3-K Oil and Gas Services, L.L.C., and Ruth Elkins, d/b/a Projects, Etc. (collectively, the Contractors) were hired by Southern Union as subcontractors to perform work at Southern Union's processing plant. Each Contractor entered into a "Service Contract" with Southern Union that detailed the terms of their agreement.

**{3}**     Each Service Contract contains an indemnity clause whereby the Contractors agreed to indemnify Southern Union

> against all claims, damages, losses, liens, causes of action, suits, judgments[,] and expenses, including attorney fees . . . of any person . . . arising out of,

2

caused by or resulting from the performance of the work . . . caused in whole or in part by any act or omission, including negligence, of the contractor . . . even if it is caused in part by the negligence or omission of any indemnitee.

**{4}**     Southern Union's processing plant receives gas from a number of separate gas wells through a series of pipelines. At the plant, the gas is run through a pressurized system called a "slug catcher" that removes condensate and other particulates from the gas. The slug catcher requires periodic cleaning in order to maintain its functionality. Danny Holguin, an employee of one of the Contractors, brought a personal injury lawsuit against Southern Union and two of the Contractors, alleging that he sustained injuries at Southern Union's processing plant in an accident that occurred during the cleaning of the slug catcher. Mr. Holguin's suit ultimately settled and is not a part of this appeal.

**{5}**     In response to Mr. Holguin's suit, Southern Union filed claims against the Contractors pursuant to the indemnity clauses in the Service Contracts, seeking indemnity from the Contractors on Mr. Holguin's claims against Southern Union. The Contractors filed separate motions for summary judgment, arguing that the indemnity clauses were void and unenforceable under New Mexico anti-indemnity statutes NMSA 1978, Section 56-7-1 (2005) (the construction anti-indemnity statute) and NMSA 1978, Section 56-7-2 (2003) (the oilfield anti-indemnity statute). The district court granted summary judgment in favor of the Contractors, holding that the indemnity clauses were void and unenforceable under both statutes and that to rule otherwise would be against the public policy of New Mexico.

**{6}**     Southern Union appeals the district court's decision arguing that neither anti-indemnity statute applies to the circumstances of this case because neither the Service Contracts nor the work being performed at the time of the accident fall within the scope of the statutes. Alternatively, Southern Union argues that if the statutes do apply, Southern Union is still free to seek indemnification against the negligence of the Contractors and, therefore, the relative percentages of negligence of the Contractors and Southern Union must be determined by an appropriate fact finder. We address each of Southern Union's arguments in turn.

**DISCUSSION**

**I.     Standard of Review**

**{7}**     "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "On appeal from the grant of summary judgment, we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. However, in a case "where a pure question of law is at issue, we will not review a grant of summary judgment in the light most favorable to the party opposing the motion[,]" but rather, we will apply a de novo standard of review that favors neither party. *Rutherford v. Chaves County*, 2003-NMSC-010, ¶ 8, 133 N.M. 756, 69 P.3d 1199.

## II. Construction of Anti-Indemnity Statutes

**{8}** Southern Union argues that the anti-indemnity statutes should be strictly construed. In support of its argument, Southern Union relies on several out-of-state cases that hold that anti-indemnity statutes must be strictly construed because such statutes restrict the freedom of contract. Additionally, citing *Wilschinsky v. Medina*, 108 N.M. 511, 516, 775 P.2d 713, 718 (1989), for the principle that strict statutory construction must be applied to acts passed in derogation of the common law, Southern Union asserts that because freedom of contract is a common law doctrine and the anti-indemnity statutes restrict that doctrine, the anti-indemnity statutes should be strictly construed to effect the least change in the common law.

**{9}** This Court has previously had the opportunity to address the enforceability of indemnity provisions in a contract, as well as the concomitant relationship between the public policy favoring freedom of contract and the public policy embodied in New Mexico's anti-indemnity statutes. *Piña v. Gruy Petroleum Mgmt. Co.*, 2006-NMCA-063, ¶ 13, 139 N.M. 619, 136 P.3d 1029. In *Piña*, our discussion was limited to the oilfield anti-indemnity statute, *id.* ¶ 1, however, our reasoning in that case applies equally well to both of the anti-indemnity statutes at issue in the present case because both statutes contain similar exceptions to the policy favoring freedom of contract.

**{10}** We have observed that the public policy embodied in both the oilfield and construction anti-indemnity statutes is to promote safety in uniquely hazardous work place environments. *See Guitard v. Gulf Oil Co.*, 100 N.M. 358, 361-62, 670 P.2d 969, 972-73 (Ct. App. 1983) (noting that the public policy behind the oilfield anti-indemnity statute is to promote public safety by not allowing the operator of a well or mine to delegate to subcontractors the duty to ensure that the well or mine is safe); *City of Albuquerque*, 2009-NMCA-081, ¶ 19 (stating that the purpose of the construction anti-indemnity statute is to promote "safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence").

**{11}** In *Piña*, we noted that by enactment of the anti-indemnity statutes, our Legislature had directly addressed the conflict between policies generally favoring freedom of contract and policies favoring safety at work sites within the scope of the anti-indemnity statutes. *Piña*, 2006-NMCA-063, ¶ 17. We concluded that the Legislature had "expressly determined that in this particular context, freedom of contract was to be subordinated to the policies furthered by the [o]ilfield [a]nti-[i]ndemnity [s]tatute." *Id.* Accordingly, in this case, we construe the anti-indemnity statutes first with a view toward furthering the public policy of safety embodied in the statutes and, as a secondary matter, in light of the public policy favoring freedom of contract.

## III. Applicability of Anti-Indemnity Statutes in the Present Case

### A. Terms of the Contracts

4

**{12}** Southern Union argues that for the purpose of determining whether either of the anti-indemnity statutes bar it from seeking indemnity from the Contractors, we should focus on the terms specified in the Service Contracts, not on the activity being performed at the time of the accident. Southern Union points out that the Service Contracts entered into between it and the Contractors specify only that "COMPANY engages the CONTRACTOR as an independent contractor to furnish equipment and perform services, hereinafter called 'Work'; and, WHEREAS, CONTRACTOR represents that it has adequate equipment in good working order and fully trained personnel capable of efficiently operating such equipment and performing the requested services[.]" Southern Union argues that the only service specified in the Service Contracts is "work" of an undefined nature, and the Service Contracts do not specifically mention gas wells, oil wells, or construction; therefore, the oilfield and construction anti-indemnity statutes do not operate to void the indemnification clauses in the contracts. We disagree.

**{13}** In support of its contention, Southern Union relies on several out-of-state cases in which various courts have held that Mississippi's anti-indemnity statute was not applicable to various types of contracts. *Lorenzen v. South Cent. Bell Tel. Co.*, 546 F.Supp. 694, 697 (S.D. Miss. 1982) (holding that the Mississippi anti-indemnity statute relating to construction contracts did not apply because the agreement at issue was a licensing agreement, not a construction contract); *see also City of Jackson v. Filtrol Corp.*, 624 F.2d 1384, 1389 (5th Cir. 1980) (holding that the Mississippi anti-indemnity statute did not apply to an agreement to create an easement); *Heritage Cablevision v. New Albany Elec. Power Sys.*, 646 So.2d 1305, 1311 (Miss. 1994) (holding that the Mississippi anti-indemnity statute did not apply to a licensing agreement).

**{14}** We note that the cases cited by Southern Union are distinguishable from the one before us. In those cases, the courts did not consider the type of work specified in the contract but instead held that the Mississippi statutes did not apply to the specific types of contracts at issue: licensing agreements and agreements for easements. None of the cases cited by Southern Union dealt with service contracts and, unlike licensing and easement agreements, the Service Contracts in the present case might easily be expected to encompass construction-related work or work at oil wells. Such a determination would necessarily bring the contracts within the scope of New Mexico's anti-indemnity statutes.

**{15}** In *Piña*, this Court analyzed an oilfield services contract in which the subcontractor merely "agreed to perform work at an oil well site." 2006-NMCA-063, ¶ 3. The generic nature of the work specified in the contract did not prevent us from determining that the anti-indemnity statute applied to the facts of that case. As the Louisiana Court of Appeals observed in *Ridings v. Danos & Curole Marine Contractors, Inc.*, 723 So.2d 979, 983 (La. Ct. App. 1998), it is customary in the oil and gas industry to use master "service contracts" that do not specifically identify the work or service to be performed. Rather, such contracts "refer in general terms to the need by one party for labor, services or materials, and the desire on the part of the other to furnish same. Specific services are later called for under the master service agreement by work orders, purchase orders or simply invoices." *Id.* at 983.

5

**{16}**    We also note that while the contracts in the present case are not specific as to the type of work to be performed, none of the parties dispute that the work being performed at the time of the accident was the type of work contemplated by the contracts. Considering that these types of generic contracts exist and are common in the very industries that our anti-indemnity statutes are designed to address, we conclude that it would not further the Legislature's intent in enacting the anti-indemnity statutes to exclude an agreement from the scope of those statutes simply because the agreement did not specifically define the type of work to be performed. Therefore, where a contract is so generic in nature that it is not possible to determine the type of work to be performed from the contract itself, we must look past the contract to the nature of the work being performed at the time of the accident in order to resolve whether the circumstances of a given case are within the scope of the anti-indemnity statutes. To hold otherwise would permit Southern Union to circumvent the anti-indemnity statutes simply by choosing not to define in its contracts the precise nature of the work to be performed. This is clearly not what the Legislature intended when it enacted the anti-indemnity statutes.

## B.    Applicability of the Oilfield Anti-Indemnity Statute

**{17}**    Southern Union argues that even if we look beyond the terms of the contract and consider the work being performed by the Contractors at the time of the accident, the oilfield anti-indemnity statute does not apply because that work did not pertain to an oil or gas well as required by the statute. We agree.

**{18}**    The oilfield anti-indemnity statute states that it is applicable to agreements "concerning any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging or otherwise rendering services in connection with a well drilled for the purpose of producing or disposing of oil, gas or other minerals or water . . . or an act collateral thereto." Section 56-7-2(B).

**{19}**    Southern Union argues that the maintenance operation on the slug catcher was not located at a well site and was not related to, or collateral to, any type of well operations defined in the statute. The Contractors on the other hand argue that a broad interpretation of the statute would bring the activities at the time of the accident within the scope of the statute. In support of their position, the Contractors urge us to look to a number of decisions from Louisiana courts that interpret the Louisiana anti-indemnity statute to apply in circumstances similar to those at issue in the present case. We note, however, that the scope of Louisiana's statute is significantly different from the scope of the New Mexico statute. The Louisiana statute states that it includes agreements "concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water[.]" LSA-R.S. 9:2780(C). Unlike Louisiana's statute, the New Mexico statute does not include any activities related to the distribution or transportation of oil and gas. *See* § 56-7-2(B). Because of the significant differences between our oilfield anti-indemnity statute and that of Louisiana, we do not find the Louisiana cases cited by the Contractors to be instructive in reaching our decision in this matter.

6

**{20}** The Contractors further argue that we should interpret the phrases "otherwise rendering services in connection with a well," Section 56-7-2(B)(1), and "or an act collateral thereto," Section 56-7-2(B)(3), as encompassing a much broader scope than the production activities at the well head. We are not persuaded that the broad interpretation suggested by the Contractors is warranted in this circumstance.

**{21}** In interpreting statutory provisions, the guiding principle should be to determine and give effect to the intent of the Legislature. *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69. The primary indicator of legislative intent is the plain language of the statute. *Gen. Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 76, 703 P.2d 169, 173 (1985).

**{22}** Where applicable, New Mexico courts have long followed the doctrine of ejusdem generis to assist in construing the language of statutes. *Lucero v. Richardson & Richardson, Inc.*, 2002-NMCA-013, ¶ 18, 131 N.M. 522, 39 P.3d 739 (filed 2001). The ejusdem generis doctrine states that "where general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." *State v. Foulenfont*, 119 N.M. 788, 791, 895 P.2d 1329, 1332 (Ct. App. 1995) (internal quotation marks and citation omitted). "In applying this doctrine, we look to the specific terms employed and seek the common characteristics among them, excluding anything that does not share those characteristics." *Lucero*, 2002-NMCA-013, ¶ 18. In *Lucero* for example, we held that the statutory language "hunting, fishing, trapping, camping, hiking, sightseeing or any other recreational use" did not include a little league baseball game because the preceding list only included "activities pursued in wilderness areas" and did not include any organized, competitive sports. *Id.* ¶¶ 18-19 (internal quotation marks and citation omitted).

**{23}** In the present case, the activities listed in the statute, "drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging," are all production activities performed at the well head. The list does not include any activities related to the distribution, processing, or transportation of the oil or gas. Furthermore, interpreting the statute to apply to all services rendered in connection with a well, as suggested by the Contractors, renders the specific list of activities superfluous. If the Legislature intended for the statute to apply to all services rendered in connection with a well, there would be no need to include the specific list of activities in subsection B. Construing the statute in this manner is inconsistent with the rules of statutory interpretation that require that "[a] statute must be construed so that no part of the statute is rendered surplusage or superfluous." *Katz v. N.M. Dep't of Human Servs.*, 95 N.M. 530, 534, 624 P.2d 39, 43 (1981).

**{24}** Applying the ejusdem generis doctrine to subsection B of the oilfield anti-indemnity statute, we conclude that the Legislature did not intend the more general language of "otherwise rendering services in connection with a well" and "or an act collateral thereto" to expand the scope of the statute to include activities away from the drilling site. Rather,

7

the Legislature intended that the general language be limited to production activities at the well head, i.e., the same types of activities as those in the specific listing.

**{25}** In the present case, the slug catcher is not located at a well site, nor is it a part the production activities associated with a well head. The slug catcher is a part of the processing system that renders the gas ready for market. We therefore conclude that the maintenance operation on the slug catcher is not within the scope of the oilfield anti-indemnity statute. We reverse the district court's grant of summary judgment in favor of the Contractors on this issue.

## C.    Applicability of the Construction Anti-Indemnity Statute

**{26}** Southern Union also argues that, looking beyond the terms of the contract and considering the work being performed by the Contractors at the time of the accident, the construction anti-indemnity statute does not apply because the work being performed at the time of the accident did not involve construction work as defined by the statute. We disagree with Southern Union and hold that the construction anti-indemnity statute does apply in this case.

**{27}** The construction anti-indemnity statute states that it applies to provisions in construction contracts. Section 56-7-1(A). The statute defines construction contract to be a "contract or agreement relating to construction, alteration, repair or maintenance of any real property in New Mexico and includes agreements for . . . other improvement to real property, including buildings, shafts, wells and structures, whether on, above or under real property." Section 56-7-1(E).

**{28}** The Contractors argue that the construction anti-indemnity statute applies to the circumstances in this case because the slug catcher is a structure on real property, and the operation being performed at the time of the accident constituted maintenance of that structure. The Contractors further state that the operation, i.e., the periodic removal of particulate matter from the slug catcher, was necessary maintenance, and was required to keep the slug catcher operating properly and in a good state of repair.

**{29}** Southern Union does not dispute that the slug catcher is a "structure" within the meaning of the statute. Southern Union also does not dispute that the work being performed at the time of the accident was required to keep the slug catcher working properly. Southern Union does assert, however, that the operation being performed on the slug catcher at the time of the accident was not maintenance as contemplated by the statute. Southern Union argues that the term maintenance as used in the statute is limited to maintenance that is required during a construction project "such as the maintenance of an existing structure while remodeling is taking place or the replacement of an old roof."

**{30}** As we have observed above, the primary indicator of legislative intent is the plain language of the statute. *Anaya*, 103 N.M. at 76, 703 P.2d at 173. "To determine the intent of the Legislature, our first step is to look at the language used by the Legislature and the plain meaning of that language." *Martinez v. Cornejo*, 2009-NMCA-011, ¶ 11, 146 N.M.

8

223, 208 P.3d 443. "[W]here there is no ambiguity in the plain language of a statute, and where no absurd or unreasonable result will occur, we apply the plain meaning rule and refrain from further statutory construction." *Id.*

**{31}** We see nothing in the plain language of the construction anti-indemnity statute that would suggest that the Legislature intended to limit the statute's application solely to maintenance operations that are required during a construction project. The statute merely states that "construction contract means a . . . contract or agreement relating to construction, alteration, repair or maintenance." Section 56-7-1(E). The statute in no way limits the scope of the term maintenance to anything other than its plain meaning. Accordingly, looking to the plain language of the statute, we apply the ordinary meaning of the word maintenance to the circumstances of this case.

**{32}** *Black's Law Dictionary* 973 (8th ed. 2004) defines maintenance as "[t]he care and work put into property to keep it operating and productive; general repair and upkeep." *Merriam-Webster's Collegiate Dictionary* 702 (10th ed. 1996) defines maintenance as "the act of maintaining" and further defines maintain as "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline." Based on these definitions of the word maintenance, we conclude that work on an improvement to real property that is required to keep that improvement in a good state of repair and operating properly is within the scope of the construction anti-indemnity statute.

**{33}** Southern Union also argues that the operation on the slug catcher was not maintenance at all but instead was merely a cleaning operation. Southern Union compares the operation being performed on the slug catcher at the time of the accident to general janitorial services such as sweeping and mopping floors, vacuuming carpets, or removing trash from offices. Based on this comparison, Southern Union argues that the construction anti-indemnity statute does not apply because the Contractors were supplying janitorial services, not construction services. Southern Union relies on a number of out-of-state cases in which courts have held that a variety of construction anti-indemnity statutes do not apply to janitorial services.

**{34}** In the present case, the system being cleaned and serviced was a large pressurized system that was an integral part of the gas processing function of a gas production facility. The slug catcher is designed to receive gas through a series of extensive pipelines and to remove condensate and other particulates contained in the gas so that the gas can be properly processed for market. It is uncontested that without regular cleaning, the slug catcher would be rendered inoperable. We disagree with Southern Union that the regular maintenance and cleaning of such a system equates to a janitorial service such as trash removal and mopping floors.

**{35}** Because the slug catcher is a structure on real property and the operation being performed at the time of the accident constituted maintenance of that structure, we conclude that the district court properly held that the maintenance operation on the slug catcher falls within the scope of the construction anti-indemnity statute.

## IV. Effect of the Construction Anti-Indemnity Statute on the Indemnity Clauses

**{36}** Southern Union argues that even if one or both of the anti-indemnity statutes apply in the present case, those statutes only preclude enforcement of the indemnity clauses in the Service Contracts to the extent that those clauses require the Contractors to indemnify Southern Union for Southern Union's own negligence. Southern Union asserts that the anti-indemnity statutes do not prohibit it from seeking indemnification from the Contractors for the Contractors' negligence. Based on this assertion, Southern Union argues that a determination of the relative percentages of negligence of the Contractors and Southern Union must be made by an appropriate fact finder and, therefore, summary judgment was inappropriate.

**{37}** The construction anti-indemnity statute states that "[a] provision in a construction contract that requires one party to the contract to indemnify . . . the other party . . . against liability . . . caused by or resulting from, in whole or in part, the negligence . . . of the indemnitee . . . is void, unenforceable and against the public policy of the state." Section 56-7-1(A). The statute goes on to state, however, that a construction contract may contain a provision that requires one party to indemnify the other party against the indemnifying party's own negligence. Section 56-7-1(B). The statute further states that an indemnity provision with a greater scope shall only be enforced to the extent permitted by Section 56-7-1.

**{38}** Where several sections of a statute are at issue, all sections must be read together so that all parts are given effect, including amendments. *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599. Reading subsections A and B of the construction anti-indemnity statute together and attempting to give meaning to all parts, we determine that the Legislature intended the language in subsection A, i.e., declaring a provision that requires indemnification for the indemnitee's own negligence to be void and unenforceable, to refer to that particular provision within the indemnity clause not the entire indemnity clause. To hold otherwise would render meaningless the language in subsection B that states that an indemnity provision shall only be enforced to the extent permitted by Section 56-7-1(B), because any indemnity clause requiring greater indemnification than permitted by subsection B would already have been held to be unenforceable under subsection A. Accordingly, we conclude that the Legislature intended that subsection B render enforceable remaining provisions in an indemnity clause that provide for indemnification against the indemnitor's negligence.

**{39}** The indemnity clause in each Service Contract states that the Contractors will indemnify Southern Union against all claims arising out of the performance of the Contractor's work "caused in whole or in part by any act or omission, including negligence, of the Contractor, . . . even if it is caused in part by the negligence or omission of any indemnitee." As we have held above, the last segment of this clause violates Section 56-7-1(A) by requiring the Contractors to indemnify Southern Union for Southern Union's own negligence, therefore, that provision of the indemnity clause is void and unenforceable. Under Section 56-7-1(B), however, the remainder of the indemnity clause that provides that

10

the Contractors will indemnify Southern Union for claims based on the Contractors' negligence is enforceable.

**{40}** Citing *Sierra v. Garcia*, 106 N.M. 573, 575, 746 P.2d 1105, 1107 (1987), the Contractors argue that because the indemnity clauses in the Service Contracts seek in part to indemnify Southern Union for its own negligence, the clauses must be held to be void and unenforceable in their entirety. In *Sierra*, our Supreme Court declined to reform an indemnification clause to excise language that required indemnification for the indemnitee's own negligence in violation of Section 56-7-1. *Sierra*, 106 N.M. at 576, 746 P.2d at 1108. We note, however, that the Court in *Sierra* was interpreting the 1971 version of the statute, which did not include the language contained in Section 56-7-1(B) of the current version. *See Sierra*, 106 N.M. at 574, 746 P.2d at 1106. Section 56-7-1(B) was added as part of the 2003 amendments to the construction anti-indemnity statute. In the present case, the parties entered into the Service Contracts at issue in 2005 and 2006; therefore, the Service Contracts are governed by the 2003 version of the statute. As we have discussed above, Section 56-7-1(B) specifically permits enforcement of an indemnity clause to the extent that it provides for indemnification from the indemnifying party's negligence. Additionally, we observe the strong dissents in *Sierra* by Justice Ransom and Justice Walters arguing that the indemnification agreement was only "void and unenforceable as to liability for indemnitee's own percentage of negligence." 106 N.M. at 576-77, 746 P.2d at 1108-09.

**{41}** Interpreting the anti-indemnity statute to permit enforcement of an indemnity clause, to the extent the clause requires indemnification for the indemnitor's negligence, is also in keeping with prior New Mexico case law in this area.

**{42}** In *Guitard*, this Court held that the oilfield anti-indemnity statute did not prohibit an indemnity clause in which a party sought indemnity from another party's negligence, even where the indemnitee was concurrently negligent. 100 N.M. at 362, 670 P.2d at 973. In that case, we held that the language in Section 56-7-2(A) "which makes void and unenforceable any agreement which purports to indemnify an indemnitee for injuries or death arising from the . . . concurrent negligence of the indemnitee means only that the indemnitee cannot contract away liability for his own percentage of negligence." *Guitard*, 100 N.M. at 361, 670 P.2d at 972 (alteration in original) (internal quotation marks and citation omitted). We specifically rejected an interpretation of the statute by which an indemnity agreement would be found to be void if the indemnitee was concurrently negligent. *Id.* We noted that by so holding, "[b]oth the operator and the subcontractor will have incentive to monitor the safety of the operation knowing that they will be responsible for their respective percentage of negligence[]" thereby furthering two important public policies: the policy of promoting safety at the work site and the policy favoring freedom of contract. *Id.* at 362, 670 P.2d at 973. The opinion construes the 1971 version of the statute; however, there is nothing in the subsequent amendments to the statute that would change our analysis.

**{43}** More recently in *City of Albuquerque*, we held that a contractor was required to indemnify and defend the City of Albuquerque, pursuant to an indemnification clause in the contract between the parties, for any cause of action arising out of the contractor's performance of the contract. 2009-NMCA-081, ¶ 20. We concluded that requiring the

11

contractor to indemnify and defend the City for the contractor's alleged negligence does not violate the construction anti-indemnity statute or the policy behind it. *Id.* We held that such an interpretation of the contract was consistent with the requirements of the statute because the construction anti-indemnity statute is based on "a public policy promoting safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence." *Id.* ¶¶ 19-20.

**{44}** Based on the language of the current construction anti-indemnity statute and New Mexico case law, we hold that the indemnity clauses in the Service Contracts can be enforced to the extent that those clauses require the Contractors to indemnify Southern Union for liability arising out of the Contractors' negligence. Because Southern Union and the Contractors settled the claims brought against them by Mr. Holguin, the respective percentages of negligence of the parties have not been adjudicated. In order to enforce the indemnity clauses as to negligence on the part of the Contractors, a determination by an appropriate fact finder of the parties' respective percentages of liability is required. Accordingly, we remand for a determination of the respective liabilities of the parties.

**CONCLUSION**

**{45}** For the reasons set forth above, we reverse the district court's order granting summary judgment under the oilfield anti-indemnity statute. We affirm the district court's decision granting summary judgment under the construction anti-indemnity statute. We remand the case for further proceedings consistent with this opinion.

**{46}** **IT IS SO ORDERED.**

 

 

                                     **LINDA M. VANZI, Judge**

**WE CONCUR:**

 

**RODERICK T. KENNEDY, Judge**

 

**TIMOTHY L. GARCIA, Judge**

**Topic Index for *Holguin v. Fulco Oil Servs., LLC*, Docket No. 29,149**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-SJ | Summary Judgment |
| | |
| **CN** | **CONTRACTS** |

| | |
|---|---|
| CN-ID | Indemnification Agreement |
| CN-IN | Interpretation |
| CN-PP | Public Policy |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |
| ST-RC | Rules of Construction |